case. Thank you. Donald R. case number. Under I don't know if you can hear me, but I'm going to try to be as quiet as I possibly can. Good morning, your honors, and may it please the court. Morning. I reserve three minutes for rebuttal. Okay. This is an easy case with a narrow issue. The government concedes that edpedeference doesn't apply because the state court never adjudicated Phillips' claim on the merits. The government doesn't seriously contest performance because counsel was completely unprepared for sentencing. When Judge Maracle asked him how long his mitigation case would take, he responded, I have no idea, Judge. I didn't get into this as a death penalty case. I don't know anything about death penalty litigation. And Judge Maracle himself concluded that counsel's performance was deficient. So the only issue at stake is prejudice. And that's easily satisfied for both per se prejudice and actual prejudice. Per se prejudice applies if counsel entirely fails to subject the prosecution's case to meaningful adversarial testing. And that's just what happened here. Counsel didn't know what to do. He was unprepared. And so he simply waved the white flag and did nothing at all. The only thing he said to the jury is that he would present no argument. And he did that in a way that affirmatively harmed Phillips' case. He suggested to the jury that any mitigation argument would simply be a waste of its time. This was a complete abdication of counsel's duty to subject the case to meaningful adversarial testing. The case is closely analogous to two important Seventh Circuit cases applying per se prejudice, Miller v. Martin and Petrosso v. Nelson. In Miller, the defendant failed to show up for trial, and the court convicted him in absentia. His counsel mistakenly believed that the conviction was invalid, and so he declined to participate at sentencing. Just as in this case, he attended the sentencing hearing. He stood by his client. And the only thing he said was that he would present no argument. I think the record reflects that counsel did confer with Mr. Phillips at some point, maybe after Judge Maracle asked whether you have any, I don't know if it was a closing argument, he did, or maybe it was opening, I don't recall, he did confer with Mr. Phillips. And what are we to make of that? We assume that maybe Mr. Phillips was fine with him not saying anything above and beyond what he said? Well, first of all, counsel couldn't have had a strategy based on that meeting because he never investigated the facts and he never learned the law before that meeting. So he went into that meeting completely unprepared. So even if Phillips had said, well, first of all, the state never makes this argument that Phillips said that. It's contrary to everything we know about the case. Judge Maracle himself said there was deficient performance. The COA from this court suggested there was deficient performance. Even if Phillips had said, I'm okay with not presenting any argument, that wouldn't have been an informed decision by the client because his attorney was completely unprepared and couldn't have informed him about the consequences, the important consequences of making that decision. So deficient performance isn't really disputed, can't seriously be disputed in this case. And the issue is prejudice. Your appeal asks for resentencing. Okay. I wonder if the law in Kentucky is still the same with regard to what sentences are available. The statute remains in effect. There are five available sentences. I mean, this is many years ago. Still the same? Correct. This statute is still in effect to my knowledge. And do you agree that upon remand, the best hope would be for that sentence that 25 to 50 years? Or are there others? Because we're told about what was presented at trial, and apparently there are five options. But there are two lower sentences. There's a marginally lower sentence of life in prison. That, under Kentucky law, would authorize parole after 20 years. So he received life, no parole for 25 years. The next one down would be parole, possibly parole 20 years. The lowest possible sentence is a term of years from 20 to 50 years. So he could be sentenced to, the lowest sentence is 20 years, which would, looking at other cases, would authorize parole at 17 years. That's where he is right now. He's been in prison for approximately 17 years. So best case scenario under the statute is he's eligible for parole immediately and would be released after 20 years. Unclear, obviously, what would happen on resentencing. And what's the highest sentence they can impose? So they could not impose death. The Kentucky Supreme Court has held that when the jury declines to impose death, it functions as an implied acquittal for the purposes of double jeopardy. So the harshest sentence he could receive is life with no parole. I've counseled my client multiple times on this, and he is certain that he wants to proceed with this appeal and be resentenced. So either under per se prejudice or actual prejudice, the case satisfies the standards for either one. I've mentioned per se prejudice. I think this is one of those rare cases where the chronic standard applies. As for actual prejudice, so again, he received a sentence of life with no possibility of parole for 25 years, could have received a marginally lower sentence. If counsel had simply raised the statutory mitigation factors that were available on the face of the trial record, that alone would raise a reasonable probability that the jury would have imposed a more lenient sentence. You know that Mr. Ferguson says, oh, for Pete's sake, those concepts that your brief raises are, there's no way that he could support any of those. What do you say about that? Emotional mitigation, severe emotional disturbance, volunteer intoxication, we know that could be offered, right? And what about moral justification? We'll just consider two of those, voluntary intoxication and extreme emotional disturbance. Margo Lewis testified at trial that Phillips was heavily intoxicated the night of the crime. That's enough for voluntary intoxication. For extreme emotional disturbance, the crime was committed during a heated dispute between Phillips, his family members, and the victims. That dispute had been simmering with prior confrontations between one of the victims, also Lee Maggard, and Phillips' stepdaughter, Kathy Davidson, and that dispute boiled over at the moment the crime was committed. So counsel could have argued and should have argued on that basis that Phillips was heavily intoxicated, that he was extremely upset, and that his decision-making was impaired because of those facts. If he had done so, he could also have argued that the Kentucky legislature has already decided that jurors should consider those factors as mitigating factors during sentencing. If he had done so, there is a reasonable probability that the jury would have imposed that marginally lower sentence of life in prison. That's especially true because the jury was already inclined to impose a lenient sentence. Now the district court's reasoning and the crux of the government's argument... It wasn't clear about how the record reflected that. I thought that their deliberations were pretty swift. Where did we get this notion that they were inclined toward a lower sentence? Questioning? What was it? Well, the jury already imposed the most lenient sentence that the prosecutor asked for. Okay. I didn't remember that. The prosecutor asked for one of the three aggravated sentences. The prosecutor asked for death or life with no parole or life with no possibility of parole for 25 years. Meanwhile, defense counsel did nothing. Didn't argue the two more lenient sentences. But they came back. Came back with the lowest of those sentences. So the district court reasoned that there was no prejudice for that very reason because the defendant didn't receive death. And that's the government's argument on appeal. That's not how prejudice works. Prejudice asks whether there's a reasonable probability of a lower sentence, not whether the defendant could have received a worse sentence. So the Supreme Court held as much in Glover v. United States where it held that an increase in even one day in prison time is sufficient for prejudice. And the court in Glover didn't ask whether the sentence could have been worse. In fact, the defendant in that case was sentenced to somewhere in the middle of his guidelines range. And the court held that that was prejudicial because he could have had a six-month lower sentence but for counsel's errors. Didn't the jury also recommend consecutive sentences here? Am I correct about that? That is correct. That was a mistake in what was said. And the judge said the sentences had to be concurrent. I'm just wondering if that maybe is an indicator that the jury saw would have been inclined to impose something less than the lowest sentence. I think the jury just misunderstood what the jury instructions were. And I think that the standard for stricken prejudice is whether there's a reasonable probability of a lower sentence. And even if there's some probability that the jury would have imposed some different sentence, there's also a reasonable probability of a lower sentence. And that's enough for prejudice. So if there are no further questions, I will reserve the rest of my time for rebuttal. Okay. Thank you. May I please forward, counsel? It is our position that I want to go through this in steps. Our position is that this is not a chronic case. That this is a case subject to strickland analysis. And chronic is really about the complete desertion by an attorney of client. From start to finish. Well, there does seem to be some indication you could leave them be or desert them for some stage. But yes, I mean, it's all tied together. Here, clearly, there was an extended guilt phase of trial. Counsel was clearly prepared for that. And equally clearly, very disappointed when the guilty verdict came back for these two intentional murders. I think that's what led to that comment, no, I'm not really ready. When the verdict's read, judge says, are you ready for penalty phase? He said, no, not really. I mean, I think he was disappointed and angry. Yeah, so if we focus on the sentencing phase, and in terms of chronic, which talks about, I guess, the absence of any adversarial testing of the prosecution's case. What did Mr. Charles do here in the sentencing phase? Well, but chronic does talk about absence of adversarial testing. But it's in terms of this desertion, like not specific steps, but complete desertion. Okay, well, what did, I guess, what did Mr. Charles do that you would consider to be any representation of his client in the sentencing phase? Well. Other than saying, look, you didn't buy what I said in the guilt phase, and so I'm not going to waste your time anymore in the sentencing phase. You pointed out that there was, when the verdict comes back, says, I'm not guilty, court says, are you ready? Counsel says, no, not really. He says, I need to consult with my client and his father. So they go back and they consult for 45 minutes. He does say, I don't know anything about death penalty litigation. I did not get into this case as a death penalty case. However, that doesn't mean that he's not familiar with the penalty phase of trial. It does not mean he is not familiar with mitigating evidence. It just, I mean, I think you've got to take him at his word. I'm not that familiar with death penalty litigation. But that's, mitigation, though, comes in at non-death penalty cases, too. They had discussed, there was discussion of mitigation. Well, I should say, the court, when approaching that closing argument, talks about, well, you've talked to your client about the possible penalties. You've talked to him. He knows that mitigation can be presented. And whether you present that, that's up to you all. And that's what the judge said? Yes. It's a discussion prior to the closing, or to the penalty phase, right after the verdict is brought. So they go back. They talk to each other, client, counsel, and father. And then they come out. The Commonwealth really didn't do much in the way of a penalty phase either. I mean, there's an opening statement where the Commonwealth says that we believe, in essence, we believe that the three aggravated sentences would be appropriate. There's no evidence by either party. The Commonwealth then does a closing statement where, again, it says, you have, in essence, already found the aggravating circumstances, multiple intentional murders. That's an aggravating circumstance. And we believe these three aggravated sentences are the appropriate sentences here. We're not going to tell you which one. But we do think one of those would be appropriate. That's the extent of the Commonwealth's closing argument. And then Mr. Phillips' counsel stands up and says, well, clearly I have not connected with you, jury. I've not communicated with you. And I'm not going to waste any more time. I'm going to sit down. I mean, I think he was saying, don't penalize my client for my failure to communicate with you. I mean, this was a capital case. I mean, is there anything in the record? It was a capital case. It was not. It was. Yeah, no, I know it was. Oh, I thought you said it was not. No, no, it was. No, it was. Yes, yes, it was. So my question is, is there anything in the record that would show that Mr. Charles did anything at all in connection with the sentencing phase in terms of investigation, exploring, mitigating evidence, other than whatever conversation he had with Mr. Phillips and his father? Is there anything that shows he did anything at all to investigate matters that would benefit Mr. Phillips and the sentencing phase? Well, Mr. Phillips points out that there are three subjects that were brought forth in the guilt phase of trial, which could have been used, and he alleges should have been used to argue for mitigation. So I would suggest that that is evidence that it was thought out, that there was reason to bring forth these subjects in the guilt phase. However, no, the trial court offered Mr. Phillips the opportunity to present, well, show me, in essence, what would have been presented that could have been presented that would have shown prejudice. So what was not presented, in effect? And there really wasn't anything. There was an affidavit by a mitigation specialist who said these things that were developed in the guilt phase, I would have explored those a little bit, and we would have, the extreme emotional disturbance, the moral right, and then the intoxication, we would have explored those a little further and made an argument on those. And then that's it. I guess I'm just saying, maybe it's not even a question, I just can't remember a death penalty case where counsel took no action at all to investigate things that might persuade a jury to recommend a sentence less than death. I was looking at the Porter v. McCollum case, which is a Supreme Court case. In that case, there was no investigation at all into mitigation. And the court examined that under a Strickland analysis. So I don't know. I want to make sure we're not in the chronic realm, that we're over here in Strickland. And so I think Porter v. McCollum is important in that regard. No investigation, and yet it was examined under Strickland. But was there representation at the hearing? No. Well, I'm sorry. In Porter, one witness was called, the wife who said he was a good father and had, I'm sorry. But they called it minimal. It was very blasé kind of evidence of mitigation. Yeah, but, you know, that's something as opposed to nothing. Well, and here, I would argue that it would not have mattered. But here, this guilt phase stuff was developed to some degree. But I would argue that it would not have mattered. And that's where we get to the prejudice. So the extreme emotional disturbance, the moral right or moral justification, and the intoxication, they were developed in a limited manner. There is no evidence that he was in any sort of enraged or inflamed state of mind. There is no evidence of any sort of triggering event. There is no evidence of any sort of need for self-defense or protection of another. This was an argument. He shows up at Ossalie Maggard's home at 12.30 at night. From the evidence, we only know that there were three people present, Mr. Phillips, Ossalie Maggard, and Geneva Young. That's the evidence. At 12.30 at night, he shows up. They argue over a debt owed, apparently, by Mr. Phillips and or his wife to one of the victims. The debt is $30. The victim says, I wasn't paid. Mr. Phillips says, you were paid partly by a stepdaughter, partly by a wife. And then the last thing is Mr. Maggard says, well, let's go get your stepdaughter and we can find out or resolve this, in effect. And that's when the shots begin. And so the evidence is no inflamed state of mind, no enraged state of mind. There was evidence that he had something to drink previously in the evening, but we don't know the timing. We don't know how much. We don't know if he was intoxicated. There's no testimonies to that. And then this moral justification, there's no reason to believe that anyone was threatened, that he was protecting himself or protecting another. So it's our position that, and on top of that, any of this would only apply to Ossalie Maggard, not to Geneva Young, who's standing over here, innocent party. And yet she is dead from a hail of bullets. So would you be making the same argument if he had been given the death penalty? I would. I would. Multiple intentional murders, one victim, from the evidence, one victim, completely an innocent party. So any justification that might have some mitigating aspect towards the one victim, Ms. Maggard, have nothing to do with Ms. Young. I'm not sure now if you're saying that, are you saying that was the lawyer's strategy, that Charles was exercising strategy because he didn't really have an answer? Well, yes, to some extent he was throwing, by saying, I failed to connect with you and I don't want to waste your time. I don't want to make you mad at my client. He, in essence, was throwing himself and his client on the jury's mercy. So, yes, it was a strategic plan. Now, it may not have been a plan that many other attorneys would have followed, but there was thought to it. He did consult with Mr. Phillips and Mr. Phillips' father. And so, yes, I believe, and I guess I should add, Mr. Phillips, he wanted to excuse himself from this penalty phase. After the guilty verdict, I mean, I think it's pretty clear there was a lot of disappointment that the jury had found guilt. Now, from our standpoint, there was plenty of evidence, but from Mr. Phillips' standpoint, it's clear that it was disappointing. And he wanted to excuse himself. Yeah, but does that excuse counsel from not asking the jury? There are five sentences here, and there are two that are lower than the one that, as I understand it, they ended up recommending, one of which is this 20 to 50 years. He didn't even ask the jury, didn't even mention to the jury. He did not, and I'm not defending his strategic choice. But I am saying that it was a strategic choice. It is not a chronic case. I'm really arguing about the prejudice. Under Strickland, there is no proof that there was prejudice. Mr. Phillips has the burden of persuasion. There is no reason to think that there's no reasonable probability that the jury would have given him a lesser sentence. No, you're going to say the same thing. What about the prior? What about them marching out with a nice, low sentence at some point? I'm sorry? They gave the lightest sentence. Well, of the aggravated. So he could have gotten 20 to 50 years. If they had given a term of years, they could have been consecutive, and consecutive up to 70 years, which is confusing. So each crime could have gotten 20 to 50. If they had given 35 for each, they could have been consecutive for 70. Could have gotten life. He did get life without parole possibility for 25 years, and then their death and life without parole at all. So, yes, they gave him the least onerous of the aggravated sentences, but there's no reason to believe they would have gone below that. I think we understand your argument. We appreciate it. Your time has expired. Thank you, Mr. Ferguson. Mr. Stander? I just have three quick points of rebuttal, Your Honors. First, counsel cannot have had a strategy, because he didn't investigate the facts and he didn't learn the law. When Judge Miracle asked him how long his case would take, he said, I have no idea, Judge. He said, I don't know anything about death penalty litigation. In context, what he was saying is he didn't know about capital sentencing proceedings. So that's one. Two, this is an appropriate case for chronic. This is a per se prejudice case. The standard under chronic and Bell v. Cohn is not abandonment, it's not desertion, it's when counsel entirely fails to subject the prosecution's case to meaningful adversarial testing. And that's just what happened here. He did nothing. He stood idly by while the prosecutor urged the jury to impose an aggravated sentence. Counsel suggests the bifurcation idea that it's not a complete abandonment because at the guilt phase he did his job. Well, again, Your Honor, so the cases frequently separate the trial phase and the sentencing phase. This is the routine application of Strickland in these contexts is courts ask what happened in sentencing and don't go back and say, well, there was good counsel at trial, so that's good enough. No case says that. I don't think that's what's being said. The question is whether what he did was some form of representation. So, no, what he did was not any form of representation. Again, the standard is under chronic, did he entirely fail to subject the case to meaningful adversarial testing? He didn't do that. He stood there just like in Miller v. Martin. He stood next to his client and did nothing. He told the jury, I'm going to do nothing. And he said that in a way that harmed the case by suggesting it's just going to be a waste of time if I do anything. So when counsel does nothing, says he's not prepared, and says it'll just be a waste of time, that meets the chronic standard. The third point, so the statutory mitigation factors, there is evidence on the record. Geneva Young, excuse me, Margo Lewis testified. This is volume three of the trial transcript, page 396. Margo Lewis testifies that Phillips is drinking pretty heavy the night of the crime. There's just no basis for suggesting that there's no evidence for the intoxication instruction. Geneva Young, who is the girlfriend of, she's one of the victims, the girlfriend of Asa Lee Maggard, the other victim. She is the one who loans the money. I explained this in the brief. She's the one who loans the money. She's clearly part of this. These mitigation factors apply equally to her, to both victims. Whether Phillips is drunk applies to both victims. It makes no difference. If counsel had simply presented those, even without conducting any mitigation investigation, without doing anything else, simply presented those that were already available, there's already a reasonable probability that the jury would have imposed a lower sentence. And I'll just ask the court to rule on Phillips' favor for either, under either per se prejudice or actual prejudice. Thank you. Okay. Thank you, Mr. Stander, Mr. Ferguson, and Mr. Stander. I see you two, second counsel today, who's representing a client under the Criminal Justice Act. So that's a really good thing for clients and the court. So we do want to thank you for taking the case in this capacity and for your representation. And, again, we appreciate both arguments today. Thank you. The case will be submitted, and you may call the next case.